UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

BARBARA BERRY, JERMAINE BERRY, individually
and as next friend for JERMAINE BERRY, JR.,
ANTONIO BERRY, individually and as next friend
for ANTHONIQUE HARRELL-BERRY, and
DEFRAZIO MORGAN,
        Plaintiffs,

Hon. Marianne O. Battani
vs.                                             Case No. 01-60089

THE CITY OF DETROIT and MAYOR DENNIS ARCHER,
DETROIT CHIEF OF POLICE BENNY NAPOLEON,
DETROIT POLICE OFFICERS JOHN DOES ##1-6,
DETROIT POLICE OFFICER WILLIAM RICE;
DETROIT POLICE OFFICER BARBARA SIMON,
DETROIT POLICE OFFICER EDWARD WILLIAMS,
in their individual and official capacities,
        Defendants.
_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT INVESTIGATOR BARBARA
SIMON AND OFFICER EDWARD WILLIAMS' MOTION
FOR SUMMARY JUDGMENT OF PLAINTIFFS BARBARA BERRY'S,
JERMAINE BERRY'S AND JERMAINE BERRY JR.'S CLAIMS**

Plaintiffs, through counsel, answers defendants Barbara Simon and Edward

Williams Motion for Summary Judgment as to Barbara Berry, Jermaine Berry, Jr., and

Jermaine berry, Sr., as follows:

1.      Plaintiffs admit that their complaint alleges state and federal constitutional

        violations arising out of their contact with police on January 19, 2001.

2.      Plaintiffs admit that their First Amended Complaint alleges that

        defendants Williams and Simon arrested and detained plaintiffs without

        probable cause in violation of plaintiffs' rights.



3.  Plaintiffs deny that there claims fail due to the defendant's having probable cause, and state that there are issues of fact as to whether defendant's had probable cause and as to whether any alleged probable cause was the basis for plaintiffs' arrests and detentions.

4.  Plaintiffs acknowledge that the defendants claim that they had information from Demeco Sylvester, but plaintiffs deny that probable cause existed for the arrests. Further, plaintiffs will be able to establish that the police were not arresting the plaintiffs based on probable cause but were effecting investigatory arrests and detentions of witnesses pursuant to the longstanding practice and policy of suspicionless arrests by the Homicide Division of the DPD.  Plaintiffs will demonstrate this through examination of the police officers, the testimony of the plaintiffs and introduction of admissions made by the officers in the police reports generated at the time of the arrests.

5.  Plaintiffs deny that defendants had probable cause to arrest Barbara Berry.

6.  Plaintiffs acknowledge the decisions indicated in paragraph 6.

7.  Plaintiffs deny that probable cause existed to arrest Barbara Berry.

8.  Plaintiffs deny that defendants had a reasonable belief as to the facts that they allege amounted to probable cause.

9.  Plaintiffs deny that defendants had a reasonable belief that Barbara Berry was lying, or that her arrest was based on this alleged belief.

10. Plaintiffs deny that the conclusion of law cited is applicable.

11.   Plaintiff can not only show that no reasonably competent officer would
      have concluded that there was probable cause to arrest Barbara Berry,
      plaintiff can demonstrate that these actual officers who arrested the
      plaintiffs did not at the time conclude that they had probable cause to
      arrest her.

12.   Plaintiffs deny that Jermaine Berry failed to identify himself to the police.
      Plaintiffs deny that the officers could have possibly believed Jermaine was
      a suspect.  Plaintiffs deny that there was a legal basis for the arrest of
      Jermaine Berry.

13.   Plaintiff can not only show that no reasonably competent officer would
      have concluded that there was probable cause to arrest Jermaine Berry,
      plaintiff can demonstrate that these actual officers did not conclude that
      they had probable cause to arrest him.

14.   Plaintiffs deny that the officers acted reasonably in arresting and detaining
      Jermaine Berry, Jr.

15.   Plaintiffs acknowledge that Defense counsel graciously sought
      concurrence.


WHEREFORE, Plaintiff requests that the Court Deny Defendant's Motion.

                                    RESPECTFULLY SUBMITTED,


                                    O'Meara & O'Meara, PLLC
                                    Corbett Edge O'Meara
                                    Attorney for Plaintiffs

January 7, 2002


3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

BARBARA BERRY, JERMAINE BERRY, individually
and as next friend for JERMAINE BERRY, JR.,
ANTONIO BERRY, individually and as next friend
for ANTHONIQUE HARRELL-BERRY, and
DEFRAZIO MORGAN,
     Plaintiffs,

Hon. Marianne O. Battani
Case No. 01-60089

vs.

THE CITY OF DETROIT and MAYOR DENNIS ARCHER,
DETROIT CHIEF OF POLICE BENNY NAPOLEON,
DETROIT POLICE OFFICERS JOHN DOES ##1-6,
DETROIT POLICE OFFICER WILLIAM RICE;
DETROIT POLICE OFFICER BARBARA SIMON,
DETROIT POLICE OFFICER EDWARD WILLIAMS,
in their individual and official capacities,
     Defendants.
_____/

**PLAINTIFF'S BRIEF IN SUPPORT OF
PLAINTIFFS' RESPONSE TO DEFENDANTS WLLIAMS AND
SIMON'S MOTION FOR SUMMARY JUDGMENT AS TO BARBARA BERRY,
JERMAINE BERRY, SR., AND JERMAINE BERRY, JR.**

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................ii

INDEX OF AUTHORITIES............................................................................iii

STATEMENT OF FACTS..................................................................................1

ARGUMENT.......................................................................................................3

       I.       WHETHER PLAINTIFFS' CLAIMS
               AGAINST THE CITY SHOULD BE
               DISMISSED...............................................................................3

       II.      WHETHER PLAINTIFFS' CLAIMS
               AGAINST MAYOR ARCHER SHOULD
               BE DISMISSED.....................................................................15

       III.     WHETHER PLAINTIFFS' CLAIMS
               AGAINST CHIEF NAPOLEON SHOULD
               BE DISMISSED.....................................................................16

       IV.     WHETHER PLAINTIFFS STATE CLAIMS
               SHOULD BE DISMISSED......................................................17

CONCLUSION....................................................................................................18

## INDEX OF AUTHORITIES

UNITED STATES SUPREME COURT

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)..............................................8

*California v Hodari, D.*, 111 SCt 1547 (1991)....................................................7

SIXTH CIRCUIT COURT OF APPEALS

*Leach v. Shelby County Sheriff*, 891 F2d 1241 (6th Cir 1989).....................................................................................17

*Marchese v. Lucas*, 758 F.2d 181 (6th Cir.1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987).................................................. ...17

## STATEMENT OF FACTS

On January 18, 2001, Eric Ellis murdered his sister because she would not give him any money to by crack cocaine. Eric Ellis, a prisoner, had absconded from the 2nd Precinct earlier that day. From the moment the offense was discovered, the only suspect was Eric Ellis, the victim's brother, whom the police knew to be a drug addict who had just escaped from Jail and who had previously been charged with a similar crime.

At 2:00 o'clock in the morning of January 19th, officers from the Detroit Police Department (DPD), led by Defendants Officer Edward Williams and Investigator Barbara Simon, "bammed" on the door of Barbara Berry's home on Ward Street in Detroit. Mrs. Berry, her son Jermaine, Sr., and Jermaine's mentally challenged son Jermaine, Jr., were arrested and taken down to police headquarters, where they were detained and interrogated for most of the day. Virtually every single "fact" recited in Defendants' joint statement of facts set forth in support of the various Motions for Summary Judgment pending before this Court are contradicted by other evidence and cannot be accepted as true for the purposes of these Motions.

All of the statements attributed to Jermaine Berry, Jr., are contradicted by his own testimony or the testimony of his father and grandmother. All disputes as to which versions are true must be resolved in favor of plaintiffs. Therefore the court must accept, for purposes of these motions, the following facts:

The Homicide Division of the DPD has a long-standing written policy and customary practice, acknowledged and condoned by the Chief of Police, of arresting and detaining witnesses and potential witnesses to homicides as an investigative tool. The

practice and policy has been in place at least as long as Defendant Napoleon has been on the force.  The Chief of Police saw nothing wrong with the policy.  The policy allowed homicide detectives to arrest and detain people without probable cause if the investigators felt it would assist in the investigation of a homicide.  The custom was practiced routinely and resulted in over four times as many people being arrested each year for homicide as there are murders.

Homicide Investigators, armed with this policy and custom, came to the Berry home in the middle of the night, brandishing guns, woke the Berrys and briefly showed a photo to the Berrys in a darkened living room.  None of the Berrys could identify the person.  Barbara Berry told the police where they could find her son Antonio.  All of the Berrys were arrested and taken downtown.

The same investigators tricked Antonio Berry into returning to his home by forcing his girlfriend to make a false emergency call to him.  Plaintiff DeFrazio Morgan drove Antonio Berry home.  DeFrazio Morgan was arrested and taken downtown with absolutely no justification being offered even at this time.

The arrests of the Plaintiffs were seizures for Fourth Amendment purposes and therefore were illegal absent probable cause.[1]

---

[1] The conduct of the police subsequent to the initial seizures of the Plaintiffs will be relevant for trial in assessing damages.  However, the initial seizure of each is the critical factor to be determined in these Motions.

# ARGUMENT

### I.   WHETHER PLAINTIFFS' CLAIMS AGAINST INVESTIGATOR SIMON AND OFFICER WILLIAMS SHOULD BE DISMISSED.

A.   There is a policy, practice and custom systematically employed by the Detroit Police Department Homicide Division whereby people who are merely potential witnesses to homicides, or who are somehow of interest to the homicide investigators, are arrested, transported and detained without probable cause or any legal basis for the arrest, transportation and detention.

Defendants deny that there ever was a policy, practice or custom of illegally arresting and imprisoning people during homicide investigations where there was no probable cause for the arrest.

A policy, practice or custom allowing for the suspicionless arrests by homicide investigators existed, and plaintiffs can prove it. Plaintiffs can prove the existence of the practice, policy and custom through the admissions of the Chief of Police, through the repeated admissions under oath by veteran homicide detectives, through the admission of statistical evidence that roughly four times as many people are arrested in Detroit for homicides as there are homicides committed, through the testimony of large numbers of people who have been unlawfully arrested by Homicide investigators without probable cause, and by the actions, testimony and statements of the participants in the instant case.

For a story published in the Detroit Free Press on March 21, 2001[2], Defendant Chief Napoleon admitted to reporters that witnesses to murders are routinely arrested like suspects and taken to headquarters against there will for questioning.  The Chief indicated

---

[2] Detroit Free Press, March 21, 2001, Exhibit B

that it was the department's long-standing policy. "If [the suspicionless arrest and detention of witnesses] is a problem, it hasn't been brought to my attention," said Chief Napoleon. "We have always processed homicide scenes that way, ever since I've been in the department." In the interview, the Chief admitted that a substantial portion of the over 4,500 people arrested by the homicide division were witnesses who were not suspected of any crime. [3]

Chief Napoleon's admissions created a firestorm, as he was obviously admitting to the wholesale violation of civil rights as the policy and custom of his department. His casual admissions of these violations and his indication that the violations were pursuant to the Department's long standing, written policies demonstrates conclusively that the policy and practice exists. The fact that Napoleon back-peddled and disowned his comments once the unlawful nature of his admissions was made aware to him doesn't diminish the importance of his initial admissions.

Plaintiffs would like to see the Defendants prove that recanting a confession makes the confession patently unbelievable. Chief Napoleon confessed that the policy existed. That alone creates a question of fact as to the existence of the policy and meets the plaintiffs' burden as to the first element articulated above. However, there is much more evidence to establish the existence of the unlawful policy, practice and custom.

Reginald Harvel and Isiah Smith were and are homicide investigators with the Detroit Police for 26 and 30 years, respectively. In 1998 Sgt. Harvel testified in a civil trial in Wayne County Circuit Court that homicide investigators "do what we have to do in order to get to the bottom of an investigation," and that "everybody that's arrested for a

---

[3] Detroit Free Press, March 21, 2001, Exhibit B

murder isn't necessarily arrested because they are suspected of committing a murder." Sgt. Smith testified in the same trial that "detaining witnesses is an investigative tool."[4].

After Chief Napoleon's confession and recantation regarding the pervasive policy and custom of suspicionless arrests by the DPD Homicide Division, media reports surfaced regarding the admissions made under oath by Harvel and Smith. Napoleon, having been made aware that suspicionless arrests are illegal and subject the City to liability, transferred both officers, stating that the unlawful conduct the officers had confessed to (and which Napoleon had also recently confessed to) would not be tolerated.

Smith and Harvel sued the City, claiming in their Complaints that the suspicionless and unlawful arrest and detention of people was the custom, policy and practice of the Homicide Division and that they had been transferred and constructively discharged for revealing the truth about the unlawful practices. Harvel and Smith sought protection under the Whistleblower's Act, claiming that their confessions and acknowledgments regarding the illegal policies practices of the Homicide Division had led to retaliation from the Police Command.[5][6]

Shortly before Smith and Harvel were to be deposed in by counsel for plaintiffs' in the instant case, the City reportedly settled the lawsuits brought by Smith and Harvel.[7] At the beginning of his deposition, Sgt. Harvel acknowledged that there was a de facto policy that allowed the detention of witnesses and potential witnesses to homicides.[8] At the depositions, both Smith and Harvel were beset with inexplicable bouts of amnesia regarding pretty much everything relevant to the claims they had made under oath in

---

[4] Detroit Free Press, March 29, 2001, Exhibit C
[5] Complaint of Reginald Harvel, Exhibit D
[6] Complaint of Isiah Smith, Exhibit E
[7] Detroit Free Press, December 18, 2001 Exhibit F
[8] Deposition of Reginald Harvel, page 15, lines 8-13 Exhibit G

court and in their Complaints.  Upon what Plaintiffs' counsel felt was a rather broad

explanation of what the attorney-client privilege protected (beneficently provided Smith

and Harvel by Defense Counsel David Zacks[9]), both Smith and Harvel decided that they

wished to invoke the very broad attorney-client privilege they believed protected them

from having to divulge any fact related in any way to any issue raised in their lawsuit.

Just as Chief Napoleon's recantation doesn't disprove his confessions, neither

their amnesia nor their refusal to answer questions disproves the admission and

accusations made and leveled by Sgts. Smith and Harvel.  Their prior testimony and

Complaints alone would create a genuine issue as to the existence of a policy, practice

and custom such that the plaintiffs meet their burden on this element.  But there is more.

Volume III, Chapter 9, Section 3 of the General Procedures for the Detroit Police

Department is entitled "HOMICIDE AND CRITICAL ASSAULT SCENES".  Section

3.2 of that chapter is entitled "Detaining Witnesses".  It reads:

3.2   Detaining Witnesses

> All witnesses to the crime scene should be identified.  When possible, the
> witnesses shall be detained in an area that will not disrupt physical
> evidence.  **Upon direction of the Homicide Section, the responding
> member shall arranger transportation for witnesses to the
> Headquarters Building for interviewing.**  (Emphasis added).[10]

The policy does not say "If a witness requests transportation", or "If a witness

wants to go downtown", the policy states that if the Homicide Investigator wants a

witness brought downtown, the witness is to be brought downtown.

---

[9] Mr. Zacks informed Sgt. Harvel that he did "not have to disclose private information that (Harvel shared with his attorney), and that if Harvel answered any questions regarding the facts underlying the allegations Harvel had made in his Complaint that answering "could constitute a waiver of (his) privilege. (Deposition of Reginald Harvel pages 31-32.)  At this point, Harvel refused to answer any more questions regarding any facts relating to his accusations of illegally detaining witnesses. Exhibit H
[10] General Procedures, Exhibit A

Plaintiffs acknowledge that elsewhere in the Procedures officers are instructed when to make and arrest and what constitutes probable cause. The existence of one policy does not eliminate the existence of a contradictory policy. Some fine distinction between "detaining" and "arresting" people may have seemed important when the Procedures were instituted. There is no constitutional distinction for Fourth Amendment seizure analysis. Any time a person's is compelled to submit to the authority of a police officer that person is "seized" for 4th Amendment purposes, and probable cause is required.[11] Section 3.2 is an unconstitutional policy that in practice calls for and mandates a custom of unlawful detentions of witnesses and potential witnesses. Like Chief Napoleon's confessions, like Sgts. Smith and Harvel's admissions and accusations, it standing alone creates and issue as to the existence of a policy.

In 1996 and 1998 DPD Homicide investigators arrested more than ten times as many people as there were murders in Detroit.[12]  Scores of people have complained that they were unlawfully arrested, without probable cause, in dragnets conducted by DPD Homicide.  Two actions seeking class action status alleging a custom of dragnet arrests by DPD Homicide have been filed in this Court.  All named plaintiffs in those actions have been listed as potential trial witnesses in this action.

Local governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although

---

[11] In order for "seizure" to have occurred, there must either be some application of physical force, even if extremely slight, or a show of authority to which the subject yields. California v Hodari. D. 111 SCt 1547 (1991).

[12] Detroit Free Press December 18, 2001, March 23, 2001 Exhibit F

the touchstone of the § 1983 action against a government body is an allegation that

official policy is responsible for a deprivation of rights protected by the Constitution,

local governments, like every other § 1983 "person," by the very terms of the statute, may

be sued for constitutional deprivations visited pursuant to governmental "custom" even

though such a custom has not received formal approval through the body's official

decision making channels. As Mr. Justice Harlan, writing for the Supreme Court said in

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 [90 S.Ct. 1598, 1613-1614, 26

L.Ed.2d 142] (1970): "Congress included customs and usages [in § 1983] because of the

persistent and widespread discriminatory practices of state officials ... Although not

authorized by written law, such practices of state officials could well be so permanent

and well settled as to constitute a 'custom or usage' with the force of law."

    B.  The basis for the arrest and detention of Plaintiffs was the unlawful
policy, practice and custom described above. The subjective
motivation for the arrests was that they were pursuant to the custom of
detaining witnesses, and the objective factors do not establish that the
officer's conduct was objectively reasonable.

While the objective reasonableness of an officers actions is important is assessing

an individual officer's motivation for the application of qualified immunity doctrine[13],

where the very facts underlying the purportedly objective assessment of the existence of

probable cause are undetermined, the application of qualified immunity can only be

decided at trial. The facts that Williams and Simon rely on to claim that qualified

immunity bars this suit as to them are by no means established. As everyone knows, all

factual disputes at this stage must be resolved in favor of plaintiffs. Therefore, dismissal

based on qualified immunity is not appropriate.

---

[13] <u>Hunter v Bryant</u>, 502 US 224 (1991)

    **R**

Barbara Berry, Jermaine Berry, Sr., and Jermaine Berry, Jr. were involuntarily taken from their home in the middle of the night by DPD Homicide investigators Williams and Simon because Williams and Simon wanted to question them regarding their knowledge of the whereabouts of Eric Ellis. This fact is proven by the testimony of the plaintiffs (which must be taken as true), by the police reports generated at the time, by the Affidavit of Barbara Simon and by the allegations made by the plaintiffs in their Complaint. The issues of whether there may have been probable cause to arrest Barbara Berry and whether the policy described above was the true motivating factor behind the arrests are issues that must be resolved by a jury. Nothing that the Defendants seek to rely on proves dispositively, or even convincingly, that there was probable cause or that any alleged probable cause motivated the arrests. There is a genuine issue of fact as to the existence of probable cause to arrest any of the plaintiffs, and as to whether the illegal customs and practices of the homicide division was the true motivation for the arrests.

The justification relied on for the arrest of Barbara Berry is that the police thought she was lying when she said she could not identify Eric Ellis when she was shown an old picture of him. Interestingly, the justification relied on for the arrest of Jermaine Berry, Sr., is, in part, that the police (who were in possession of the photo that they believed so clearly depicted Eric Ellis that it was a crime for Barbara Berry to fail to identify him) **supposedly thought Jermaine Berry, Sr. might be Eric Ellis.** The rationale for taking Jermaine, Jr. from his home in the middle of the night was that it was for his own good, as his father and grandmother were being arrested[14].

---

[14] Because the arrest of Jermaine, Jr.'s father and grandmother was unlawful, their illegal arrests (if they did necessitate taking Jermaine, Jr., downtown as defendants alleged) amounted to a de facto seizure of Jermaine, Jr., as well. If the arrests of Jermaine's caregivers were unlawful, the arrest of Jermaine, Jr., was

The fact that Simon and Williams have not even brought forth a motion to dismiss for the claims made against them by DeFrazio Morgan, and have at no point, including in the affidavit and statement of facts accompanying this Motion, suggested that his arrest had any legal justification, is illuminative to this Court in determining the true motivations and reasonableness of Williams and Simon's conduct that night.

Every police report generated at the time of the arrests that indicates a basis for the arrests states that the Berrys were arrested for questioning. In the police report of Officer Adolph Wilson, he specifically states that there were "no arrests," and that Jermaine Berry and DeFrazio Morgan were "convayed (sic) to Hdqts for questioning".[15] Officer Michael Johnson, who actually arrested and transported Barbara Berry at the request of Williams and Simon, indicated clearly in his PCR that her status was that she was "detained", as opposed to arrested.[16] Defendant Edward Williams acknowledges in his Investigator's Activity Log that he "had [Barbara Berry] and several other subjects conveyed to Homicide Base. Re: Case 01-12" (the Eric Ellis case).[17]

No officer indicates anywhere in any police report that the supposed justifications relied on by the defendants for the arrest of the Berrys existed at the time. The fact that the uniformed officers' reports contradict the justifications put forth, coupled with the fact that Defendant Edward Williams simply dumps Barbara Berry in with several other subjects he "had conveyed" to Homicide regarding the Eric Ellis case, speaks volumes about the true motivation behind the arrests. The arrests were made as a matter of routine because that's the way it has always been done. There is absolutely no corroboration for

---

unlawful as well. There is no suggestion that Jermaine, Jr., exercised any choice or free will in his transportation and detention by defendants.
[15] PCR of Officer Adolph Wilson Exhibit I
[16] PCR of Michael Johnson, Jr., Exhibit J
[17] Investigator's Activity Log of Edward Williams, Exhibit K

the proposition that the arrest of the Berrys were based on the existence of probable cause that they had committed some crime.  The fact that in retrospect the police can suggest that there may have been some possible rationale for the arrest of Barbara Berry does not negate the fact that it is much more likely that her arrest was pursuant to the custom of the department.

Police officers are trained and mandated to record their actions and the basis for their actions.  The officers who arrested the Berrys did just that.  Their reports can be relied on to prove the true motivation for the arrest of the Berrys. The Berrys were arrested pursuant to the policy of arresting witnesses for questioning.

The defendants claim that there is no question as to the issue that the motivation behind the arrest of Barbara Berry was the fact that Jermaine Berry, Jr., identified the person in the photo he was shown and that he knew the person was named Eric.  There couldn't be a greater question as to whether those averments are true. The Defendants seek to use the testimony of Jermaine Berry, Jr., a seven-year-old special education student who appeared at his deposition to be willing to answer any question any way the questioner wanted it answered, as their "proof" that probable cause was the motivation for the arrest of Barbara Berry.  On the exact same multi-page deposition transcript excerpted by the defendants in their effort to prove that Jermaine, Jr. did recognize the picture he was shown, and that he did know Eric Ellis' real name, Jermaine, Jr. flatly states that he did not know who the person in the picture was, that it was the police who identified the person as Hustleman or Eric, and that Hustleman had been at his grandmother's house when Jermaine was 5, and not that day[18].

---

[18] Deposition of Jermaine Berry, Jr., pages 32-33, Exhibit L

One of the most telling pieces of evidence that plaintiffs can rely on in response to the Motions pending and at trial is the affidavit Barbara Simon executed in defendants' efforts to dismiss this action.[19]  In this affidavit, Investigator Simon, now represented and presumably advised by counsel after being sued for arresting people without probable cause, defends her actions with respect to Jermaine Berry, Sr. by stating he was arrested because he could not be "ruled out" as a suspect or accomplice.  That affidavit standing alone is proof that Jermaine Berry, Sr., was arrested unlawfully.  Plaintiffs humbly suggest to the Court and to the Defendants that arrests are to be made when one is "ruled in" as a suspect, rather than "not ruled out".

Investigator Simon makes conclusory allegations in her affidavit that are not corroborated by any police report generated at the time of the arrests.  Defendants rely on the suggested and contradictory testimony of a mentally challenged child to erase the existence of doubt regarding the circumstances that led to the arrest of Barbara Berry. The affidavit of Investigator Simon proves in and of itself that it is objectively unreasonable to conclude that Barbara Berry's failure to identify the person in the photo amounted to probable cause to believe that a crime had been committed. Investigator Simon, who had the photo in her hand, supposedly arrested Jermaine Berry, Sr., because "we could not rule him out as the suspect".  If Investigator Simon didn't know whom the picture was of, how could Barbara Berry be committing a crime when she didn't recognize it?

For this Motion, the Court must take, as true, the following facts:

1.       Jermaine Berry, Jr. did not recognize the picture he was shown;[20],[21]

---

[19] Affidavit of Barbara Simon, Exhibit M
[20] Deposition of Jermaine Berry, Jr., page 33, Exhibit L

2.    The police told Jermaine Berry, Jr. who was in the picture;[22]

3.    Jermaine Berry, Jr., did not give the police any information while he was at his grandmother's house.[23]

4.    Barbara Berry never told Jermaine, Jr. not to talk to the police;[24]

5.    Barbara Berry never told Jermaine, Sr., not to talk to the police;[25]

6.    Barbara Berry never told the police she and her grandson were alone in the house;[26]

7.    There was very little light in the house when the photo was shown to the Berrys.[27]

8.    The photograph did not accurately depict Eric Ellis.[28]

---

Q: Did you say you knew that person?
A: No
Q: What did you tell the police?
A: I said I don't know that person

[21] Deposition of Jermaine Berry, Jr., page 11-12, Exhibit N
Q: You recognized the photograph?
A: No
Q: You didn't?
A: No

———

Q: Did you ever tell the police that you recognized Eric?
A: No
Q: Did you ever tell the police that you recognized Hustleman?
A: No

[22] Deposition of Jermaine Berry, Jr., page 33, Exhibit L
Q: Did [the police] tell you the person was Eric?
A: Yeah

[23] Deposition of Jermaine Berry, Sr., page 19, Exhibit O
Q: When your son came down, do you remember the police asking him any questions?
A: No. They didn't ask him nothing.

[24] Deposition of Jermaine Berry, Jr., page 15, Exhibit P
Q: Did [Barbara Berry] tell you not to talk to the police?
A: No

[25] Deposition of Barbara Berry, pages 10-13, Exhibit Q
[26] Deposition of Barbara Berry, pages 10-13, Exhibit Q
[27] Deposition of Jermaine Berry, Sr., page 20, lines 11-12, and page 21, lines 1-4, Exhibit O
A: "[T]here weren't no lights." Page 20
Q: Was the dining room light on at your house?
A: Ain't no lights on.
Q: No lights at all?
A: No lights but the TV and the hallway light at the front door.

9.   Barbara Berry did not recognize the picture she was shown;[29]

10.  Barbara Berry told the police where they could find her son Antonio;[30]

**The evidence, taken in the light most favorable to plaintiff, shows probable cause to arrest Barbara Berry did not exist.**

Simon and Williams argue there was probable cause.  They cite the following facts, beginning on page 8 of their Brief:

1.  The officers had information that the suspected murderer had told someone he was incarcerated with that he might go to a house on Ward. (According to Demeco Sylvester, Ellis said he was going to the third house from the corner, and the Berry home is the second house from the corner, but this statement by the Defendants is true enough).

2.  Mrs. Berry intentionally lied to the officers when they showed her a picture. (Denied By Mrs. Berry in her deposition and therefore untrue for purposes of this Motion).

3.  Jermaine, jr. told the officers some things. (Denied by Mrs. Berry, Jermaine Berry, Sr., and Jermaine, Jr., in their depositions, and therefore untrue.)

Because of the allocation of doubt mandated in deciding this motion, it simply cannot be argued that there can be no conclusion save that there were objective facts that would lead a reasonable officer to conclude probable cause existed to arrest Barbara Berry.  She was shown a picture and said she didn't recognize the person.  There is no

---

[28] Deposition of Jermaine berry, Sr., page 21, lines 14-18, Exhibit O
[29] Deposition of Barbara Berry, page 11, Exhibit Q
[30] Deposition of Barbara Berry, page 12, Exhibit Q

undisputed fact that can be relied on to show that objective probable cause existed. If Defendant's believe they can prove probable cause existed, that's what trials are for.

**There was no probable cause to arrest Jermaine Berry.**

The suggestion that Jermaine Berry, Sr., was arrested because he couldn't provide identification in a private home is (with all due respect) ridiculous. Again, he denied he failed to produce identification, so for the purposes of this Motion it is not true. The affidavit of Barbara Simon, which speaks volumes, states that she arrested Jermaine Berry, Sr., because "we could not rule him out as a suspect or an accomplice". The day that arrests are acceptable when the police cannot rule you out as a suspect has not, Plaintiffs pray, come to pass as of yet. Any officer (and any attorney advising an officer) certainly ought to realize that arrests are made when a person is "ruled in", and not when the person cannot be "ruled out". What more could the plaintiffs need to create an issue of fact as to the true motivation of the officers in making these arrests? In the very affidavit used to try to justify in Court the conduct of the officer who with her partner ordered the arrest of the Berrys and DeFrazio Morgan, the officer states that she arrested someone because she could not "rule them out."

For these reasons, Plaintiffs request that the Motion for Summary Judgment be denied as to Defendants Williams and Simon.

## CONCLUSION

For the reasons articulated, Plaintiffs respectfully request this Honorable Court Deny Defendants Williams and Simon's Motion for Summary Judgment.

RESPECTFULLY SUBMITTED,

O'Meara & O'Meara, PLLC
Corbett Edge O'Meara
Attorney for Plaintiffs

January 7, 2002

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED